STATE OF NEW JERSEY, DEFENDANT IN ERROR, v.
JOSEPH H. CARR, PLAINTIFF IN ERROR.

Argued February 2, 1937—Decided April 30, 1937.

For the plaintiff in error, *Merritt Lane, Carl Kisselman*
and *George D. Rothermel.*

For the defendant in error, *Samuel P. Orlando,* prosecutor
of the Pleas.

The opinion of the court was delivered by

HEHER, J.   We perceive no error in the judgment under
review.

But we do not yield assent to the view that a "constructive
bailment," defined in *Gilson* v. *Pennsylvania Railroad Co.,*

86 *N. J. L.* 446 (a case involving, it will be noted, only the civil rights of private parties), as one arising "where the person having the possession of a chattel holds it under such circumstances that the law imposes upon him the obligation to deliver it to another," is within the intendment of section 184 of the Crimes act (2 *Comp. Stat.* 1910, *p.* 1799), classifying as a misdemeanant "any consignee, factor, bailee, agent or servant, entrusted with the care or sale of any personal property, or entrusted with the collection or care of any moneys, who shall fraudulently take or convert the same, or the proceeds of the sale of the same, or any part thereof, to his own use, or to the use of any other person or persons whatsoever, except the rightful owner thereof."

In its broad signification, the term "bailment," derived from the French "bailler," meaning "to deliver," includes "any delivery of personal property in trust for a lawful purpose." 6 *Am. Jur.* 140. While it is a relationship that ordinarily rests in contract, express or implied in fact, there is also a class of bailments, *quasi*-contractual in nature, which arise by operation of law "where, otherwise than by a mutual contract of bailment, one person has lawfully acquired the possession of personal property of another and holds it under circumstances whereby he ought, upon principles of justice, to keep it safely and restore it or deliver it to the owner, for example, where possession has been acquired accidentally, fortuitously, through mistake, or by an agreement, since terminated for some other purpose; * * * such *quasi* contracts of bailment include what are known as constructive and involuntary bailments." 6 *Am. Jur.* 209, 210.

The question is in essence one of legislative intent. Embezzlement was not punishable as a crime at common law. It signified a mere breach of trust. Its criminality is wholly statutory in origin; and it is an established canon of interpretation in this state that a penal statute is to be strictly construed. The design of the statute under consideration was to render criminally actionable offenses which, because the taking was not accompanied by a trespass and the requisite felonious intent, were not classified as larcenies at common law.

Plainly, the basic relation contemplated by the statute is essentially fiduciary in character. It imports a true bailment, *i. e.,* one springing from the mutual assent of the parties. To fall into the statutory class, the offender must have been "entrusted" with the care or sale of personal property, or with the collection or care of moneys.

Here, there was evidence tending to show that plaintiff in error, Carr, in relation to the moneys in question, was the bailee of the Camden Safe Deposit and Trust Company in the statutory sense. There was ample evidence to sustain a finding that, in respect of these moneys, he bore to the bank the requisite fiduciary relation, rather than that of debtor and creditor. He was the author of the scheme which resulted in the advancement by the bank of the funds necessary for the purchase of the properties at the tax sale. The bank's interest was that of a creditor of the landowners. Carr was a member of and counsel for the creditor's committee, of which the bank's president was also a member.

Notwithstanding the latter's testimony touching the relationship of Carr to the bank, it was open to the jury to find that, in respect of the payments made by the municipality to Carr upon the redemption of the tax sale certificates, Carr was the bank's bailee. The testimony of the bank's president was essentially interpretative in character. For instance, in reply to the question as to whether Carr acted as attorney for the bank, he said "it's hard to define what his position was." While he testified that there was no express authority given to Carr to "collect the money," this was fairly to be implied under the circumstances. Proof was adduced that, in earlier proceedings in equity to enjoin the municipality from selling the lands for subsequent taxes and assessments, Carr testified that the prior tax sale purchases were made "for the benefit" of the creditors' committee—for "the protection of the interest of these creditors"—and that he was acting in the transaction as attorney for the "group of creditors." He said: "I wasn't the special counsel of each bank, but I was acting as counsel for the group of creditors." The creditors' committee was not in funds for the purpose, and, without

committee action, the bank authorized Carr to purchase the lands at the tax sale for the benefit of all the creditors represented by the committee, with funds to be provided by the bank, repayment of which was to be secured by an assignment of the tax sale certificates.

Although he authorized Carr to advise the municipality that the bank would consent to its redemption of the tax sale certificates, the bank's president said, "there was no arrangement made as to how the settlement was to be completed." He gave Carr no instructions as to the proposed settlement, except to say the bank was "ready to receive the money." When the municipality did not promptly exercise its option to redeem the certificates, in accordance with the decree in Chancery, Carr, again acting for the bank, although proceeding in the names of the nominal purchasers, caused suit to be instituted in Chancery for the foreclosure of the tax sale certificates. These certificates were all the while in his possession. He concededly held them for the bank. He had testified in the equity proceedings referred to that one of the reasons for making the purchase in the name of Leuthy, was that "it would obviate the necessity of buying in the names of all these creditors."

And Carr's subsequent conduct also makes evident a consciousness of a fiduciary relation to the bank and of his responsibility to the bank alone for the money so received. He concealed his peculations from the bank; and, when he was forced to admit them, he proposed an assignment of fees to accrue for services rendered in pending cases as security for the repayment of the moneys thus unlawfully taken.

Piercing the form, the jury could have found the substance of the transaction to be that Carr held the tax sale certificates as bailee for the bank, and that, in virtue of a mutual understanding, express or implied in fact, he received the moneys in trust for delivery to the bank, and he was therefore a "bailee entrusted" with the collection and care thereof.

The fraudulent conversion of moneys so received is within the statutory category. It is not requisite that the moneys embezzled be received direct from the bailor. *State* v. *Geyer,*

81 *N. J. L.* 591; *State* v. *Lyon,* 45 *Id.* 272. It is the general rule that an attorney who collects money for his client, and converts it to his own use, is guilty of embezzlement, either under a statute applying to attorneys in express terms, or by virtue of one punishing, generally, persons who appropriate to their own use property entrusted to them, or one denouncing embezzlement by bailees. 20 *C. J.* 447.

The English courts have so construed a statute substantially like ours. It provides (24 & 25 *Vic. ch.* 96, § 3) that "whosoever, being a bailee of any chattel, money, or valuable security, shall fraudulently take or convert the same to his own use or to the use of any person other than the owner thereof, although he shall not break bulk or otherwise determine the bailment shall be guilty of larceny." The English cases cited in *State* v. *Deutsch,* 77 *N. J. L.* 292, 298, lay down the principle that one may be a bailee under this enactment, without having received possession of the goods direct from the bailor. And in *Reg.* v. *Bunkall, Leigh & C.* 371; 9 *Cox C. C.* 419, the prisoner was entrusted with money to buy coals, which, for remuneration, he was to bring home to the prosecutor in the prosecutor's own cart. The prisoner, having bought the coals, abstracted a portion of them with the intention of appropriating such portion to his own use; and it was held that, in respect of the coals, there was a bailment within the terms of the statute. Likewise, it has been held that when a carrier delivers goods and embezzles the price, although he cannot be indicted for embezzling the goods, he may be for embezzling the money. *Reg.* v. *Wells,* 1 *Fost. & F.* 109; *Reg.* v. *Aden,* 12 *Cox C. C.* 512; 29 *L. T. N. S.* 467.

We concur in the conclusions of the Supreme Court on the other questions raised and argued.

Judgment affirmed.

*For affirmance*—The Chancellor, Parker, Lloyd, Bodine, Heher, Hetfield, Dear, Wells, WolfsKeil, Rafferty, Cole, JJ. 11.

*For reversal*—None.