35 N.J. Super. 494 (1955)
114 A.2d 474
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
SAMUEL BOBBINS, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued May 9, 1955.
Decided May 23, 1955.
*496 Before Judges CLAPP, JAYNE and FRANCIS.
Mr. David R. Brone, First Assistant Prosecutor, argued the cause for the respondent (Mr. Lewis P. Scott, Atlantic County Prosecutor, attorney).
Mr. Joseph Tomaselli argued the cause for the appellant (Messrs. Malandra & Tomaselli, attorneys).
The opinion of the court was delivered by FRANCIS, J.A.D.
Defendant was convicted of embezzlement under an indictment which charged that,
"on divers days between the 1st day of December, 1951, and the 5th day of May, 1953, being the agent of Mayfair Apartments, Inc., a corporation of the State of New Jersey, his principal, and as such agent entrusted with the care and collection of rent moneys and payments due to such corporation, and having as agent received, collected and obtained from tenants of said corporation the sum of $88,785.44, the property of the said Mayfair Apartments, Inc. * * * (he) did willfully, unlawfully and feloniously retain and appropriate to his own use the said sum of money aforesaid, knowing the same to belong to the said Mayfair Apartments, Inc., * * * with intent to defraud the said Mayfair Apartments, Inc. * * * contrary to the provisions of N.J.S. 2A:102-5 * * *."
It is argued that the statute on which the indictment is based is void as vague and indefinite and consequently repugnant to the Fourteenth Amendment of the Federal Constitution. More specifically it is claimed that a penal statute creating a new offense must be explicit in its description of the conduct proscribed and that due process is violated where its terms are so vague that men of common intelligence must guess at the meaning. Lanzetta v. State of New Jersey, 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888 (1939).
N.J.S. 2A:102-5 became effective in its revised form on January 1, 1952 (L. 1951, c. 344). It provides:
"Any employee, agent, consignee, factor, bailee, lodger or tenant who embezzles or, with intent to defraud, takes money or receives, retains or appropriates to his own use or the use of another, any property or the proceeds of the sale of the same, or any part thereof, *497 belonging to his employer, principal, consignor, bailor or landlord, is guilty of a misdemeanor."
The suggestion is that use of the word "embezzles," which did not signify a crime at common law, without specific definition as to what is being made criminal, renders it necessary for the public to speculate about the nature and elements of the crime. Further it is said that in the context "embezzles" stands alone disconnected from the remainder of the sentence, so that no answer is provided for such questions as: "Embezzles what?" and "Embezzles from whom?"
We find no legal merit in these criticisms. Although the construction and perhaps the punctuation of the sentence could be improved, the implication is plain so far as the present case is concerned. An employee, agent, consignee, factor, bailee, lodger or tenant is guilty of embezzlement if (a) he embezzles money belonging to his employer, principal, consignor, bailor or landlord, or (b) if with intent to defraud he takes money belonging to his employer, principal, consignor, bailor or landlord that has come into his possession lawfully.
Moreover the connotation of the word "embezzles" is obvious. It has had a settled significance in the law from the time of the first judicial declaration that conversion or misappropriation of money or property of an employer or principal by a servant or agent which had been entrusted to him by another, did not constitute common-law larceny. Since then embezzlement has meant generally the intentional and fraudulent appropriation of the property or money of another by a person into whose hands it had lawfully come or to whom it had been entrusted. State v. Carr, 118 N.J.L. 233 (E. & A. 1937); State v. Woodward, 99 N.J.L. 49 (Sup. Ct. 1923); State v. Egan, 84 N.J.L. 701 (E. & A. 1913); 29 C.J.S., Embezzlement, § 1; 2 Wharton, Criminal Law (12th ed. 1932), p. 1568, § 1258; 2 Burdick, The Law of Crime (1946), § 562; Webster's New International Dictionary. The definition was so well known that in 1529 the first statute known to deal with such breach of trust made it a felony for any servant to "embesill" his *498 master's caskets, jewels, money, goods or chattels or any part thereof, above the value of forty shillings. 21 Henry VIII, ch. 7; 3 Coke's Institutes, p. 105.
It has been said that the single word "embezzle" in an indictment contains within itself the charge that the defendant fraudulently appropriated the money or property to his own use. People v. Catcott, 393 Ill. 582, 67 N.E.2d 175 (Sup. Ct. 1946); State v. Hudson, 93 W. Va. 435, 117 S.E. 122 (Sup. Ct. App. 1923); 2 Burdick, supra, § 585.
Next it is claimed that the indictment fails to charge this statutory crime. Again we find lack of substance.
Defendant points to the allegation of the indictment that he "received, collected and obtained" from the tenants of Mayfair Apartments, Inc., "the sum of $88,785.44" and "did willfully, unlawfully and feloniously retain and appropriate" it to his own use. And he says that since the statute uses the word "receive" only in connection with "property" which, in the context, must be distinguished from money, it is not made a crime to receive money and appropriate it to one's own use. But the indictment "received" is a factual statement intended to explain how the money came into Bobbins' hands. In other words, the State alleged that he was the agent of Mayfair Apartments, Inc., for the purpose of collecting rents from its tenants, that because of the fiduciary relationship he received (became entrusted with, came into possession of) the money in question and that he willfully and unlawfully appropriated it to his own use. This asserts a classical case of embezzlement.
Reversal is sought also because of the refusal to grant the motion for judgment of acquittal and because the verdict of guilty is said to be contrary to the weight of the evidence. Consideration of these contentions requires a statement of the facts.
Bobbins held some options on an assembled parcel of land in Atlantic City which was adaptable to apartment house construction. One Kaufman had an F.H.A. mortgage commitment for such a structure. However, the two men were unsuccessful in their efforts to promote the financing of the *499 project. Ultimately and with their assistance, Anthony P. Miller acquired the commitment. This involved a payment of $13,000 so far as Bobbins' interest was concerned. He received about $4,000 personally and the remaining $9,000 was paid to certain of his creditors. In addition, an agreement was made that he would be appointed rental manager of the apartment house project at a commission of 5% of the rentals.
Miller then organized Mayfair Apartments, Inc., of which he became the president and principal stockholder. Bobbins was appointed rental agent by written contract signed by Miller as president. It was for a term of two years but had been renewed until December 31, 1953. The 5% commission was provided for and the rents upon collection were to be deposited in a special Mayfair bank account.
In October and November 1952 there was not enough money in the rental account to meet operating expenses and Miller had to advance $12,000 to prevent the corporation from becoming in default. On inquiry, Bobbins gave as the reason that a number of the tenants were in the South on vacation and that he would collect the delinquent rents when they returned in March and April. In March the deposits did not increase and the auditors, who apparently were engaged in the annual audit for 1952, informed Miller of the discovery of a $45,000 shortage in the rental account. He wrote Bobbins advising him of the serious nature of the matter and that he would have to notify the bonding company. Bobbins replied by letter reiterating the earlier statement that a large percentage of the tenants were summer residents who had not been occupying the apartments in the cold weather but who might be expected to return after March 15. He enclosed also a copy of a form letter which he said was being sent to these tenants who were in default in their rent.
The audit continued and ultimately revealed a total shortage of $100,244.59. This sum, less 5% commission, left a deficit of $88,785.44, the amount charged in the indictment to have been embezzled. Bobbins admitted the shortage and that he had received rents representing that amount plus *500 his 5% commission, and had used the money for his own purposes. He was discharged on May 5, 1952.
The defense was that the $88,785.44 represented a form of loan and not a criminal defalcation. Defendant asserted that after the agency contract had been made, he told Miller about financial obligations he had incurred in the course of his original efforts to accomplish the apartment construction. He said that Miller was told also of certain moneys he was to receive, such as a "kickback" from the architect's fees amounting to $40,000. As a consequence an understanding was reached that Bobbins would collect certain rents in advance from the tenants, and that he could use these moneys within reason in connection with an independent operation of his own, so long as the Mayfair Apartment accounts and obligations were kept current. It must be said that the testimony with respect to this understanding, which was specifically and emphatically denied by Miller, was most ambiguous and the description of the nature of the loan and how repayment was to be made was most tenuous. And the assertions of the defendant on the subject stood alone.
After the discovery of the shortage, there were meetings with representatives of the bonding company and others and at no time did Bobbins assert the loan scheme. On these occasions Bobbins admitted using the money and said he would pay it back. He never claimed that it was a loan or that it was used with permission. Miller's attorney said that in one conference with him defendant admitted that he had no right to take the money. There was considerable evidence that at one of these conferences Miller called Bobbins a "no good thief" to which he made no answer. At another, according to an accountant who was a witness, defendant's own attorney (not trial counsel) said in Bobbins' presence that "he could not prevent Mr. Bobbins from going to jail, but that if he were allowed time he felt this matter could be worked out and restitution made or the funds returned."
Enough has been detailed to demonstrate that the issue of whether a debtor and creditor relationship existed *501 between the defendant and Mayfair Apartments, Inc., or whether Bobbins was an embezzler, was for jury determination and that the trial court did not err in refusing to acquit. Likewise it is equally plain that the verdict of the jury was not contrary to the weight of the evidence. The record reveals more than ample evidence to justify the conclusion.
The further argument is advanced that a person cannot be convicted of embezzlement if he has an interest (such as Bobbins' 5% commission interest) in any part of the converted money. If the funds are not entirely the property of another, it is urged that the crime cannot be committed.
It is true that in the cited case, State v. Kent, 22 Minn. 41, 21 Am. Rep. 764 (1875), the Supreme Court of Minnesota so held. Aside from the unrealistic character of such a pronouncement, the Legislature of Minnesota shortly thereafter nullified it by statute. Annotation, 13 L.R.A., N.S., 511, 512. The general rule, and we think the better one, appears to be to the contrary. Commonwealth v. Jacobs, 126 Ky. 536, 104 S.W. 345 (Ct. App. 1907); Annotation, 13 L.R.A., N.S., 511; 18 Am. Jur., Embezzlement, § 11; 2 Wharton, Criminal Law (12th ed. 1932), p. 1627, § 1316.
Furthermore, the management contract here provided that:
"All rents and other income collected by the agent shall be deposited in a special bank account in the name of the owner and shall not be mingled with the funds of the agent. * * * All rent and other income, * * * shall be deposited by the agent not later than the next banking day following the receipt thereof, and failure so to do shall constitute a breach of this agreement.

* * * * * * * *
"Article IV (C)
The owner agrees to pay the agent five percent of the gross collections for leasing and management during the period provided herein, less commissions on any rents, concessions, or rebates paid to tenants. * * *." (Emphasis ours)
The record presented to us is not clear as to how the 5% commission was paid to defendant. There is nothing in the agreement indicating that Bobbins had authority to draw checks on the rent account. The plain indication from the language employed is that he would be compensated by the owner. Whether a practice had grown up under which Bobbins *502 in some way deducted his commissions before depositing the rents is not disclosed by the appendix.
But it is clear that rents totaling $100,244.59 were never deposited at all in the corporate account. That entire sum, which included $11,489.15 of commissions, was put to his own use. The balance above the commissions he held as an agent for the corporation and he was duty bound to deposit it as agreed. Willful and fraudulent conversion thereof to his own use would constitute embezzlement. Commonwealth v. Jacobs, supra.
A number of errors in the conduct of the trial are asserted. Some of them we shall discuss.
When Miller produced the letter of early March from defendant explaining the shortage in the rent account and enclosing a copy of a letter claimed to have been sent to the delinquent tenants, he was permitted to testify that after talks with some of the tenants he felt that it was never sent; the tenants never received it; there were no rent arrearages. Although hearsay statements were thus permitted, in our judgment no prejudicial error resulted. The defendant admitted that he had collected the rents involved and the fact of his shortage. And there was an abundance of other proof introduced showing that the tenants were not delinquent.
Further in connection with this letter of March 4, defendant undertook to testify that it was dictated by Miller himself in order to assist him in collecting from Bobbins' bonding company. An objection by the State was sustained. This might have constituted error of substantial proportions. But the proof shows that defendant testified to the very matter on cross-examination by the State.
Again defendant complains of the admission of the testimony that Miller called him a thief  even though he made no answer. The proof was clearly proper. State v. Toohey, 6 N.J. Super. 97 (App. Div. 1950); Donnelly v. State, 26 N.J.L. 601, 612 (E. & A. 1857).
Error is assigned because of the failure of the court to grant a mistrial or to instruct the jury to disregard certain *503 remarks of a witness. It appears that an attorney for Miller who had attended some of the conferences in connection with the shortages was asked whether Bobbins had given any account of the deficit other than that it was a mistake and that the tenants were in arrears. After answering in the negative, he added a statement to the effect that the first time he ever heard the claim that the deficit represented a loan was in court when defense counsel opened to the jury. While the volunteered information was not strictly responsive to the question, in view of the testimony as to defendant's attitude at the various conferences, we fail to discern any manifest prejudice suffered by him or any mistaken abuse of discretion by the trial court in ignoring the matter.
The other errors assigned relating to admission and rejection of proof and the alleged undue limitation of the cross examination of Miller have been considered. They require no specific discussion. It is sufficient to say that they present no basis for reversal. The same is true with respect to the requests to charge which were denied. Our examination of them has led us to the conclusion that their substance was included either in the main charge of the court or in other requests of the defendant which were in fact charged.
The judgment of conviction is affirmed.