PENTHOUSE INTERNATIONAL, LTD., PLAINTIFF, v. EASTMAN KODAK COMPANY, DEFENDANT.

Superior Court of New Jersey
Chancery Division Bergen County

Decided December 22, 1980.

*Patrick C. English* argued the cause for plaintiff (*Dines & English*, attorneys).

*William L. Dill, Jr.*, argued the cause for defendant (*Stryker, Tams & Dill*, attorneys).

LESTER, J. S. C.

This case comes before the court on cross-motions for summary judgment. The issue presented is whether a publisher of a magazine for men may require a private entrepreneur, processor of film, to develop and print film which the processor finds offensive, distasteful and, in fact, in violation of its corporate policy.

Defendant maintains that this is a contract case—one which may be decided on the narrow contract issue. Plaintiff, on the other hand, contends the primary issue is one of censorship; that First Amendment Constitutional rights are involved, along with a possible antitrust violation.[1]

On the narrow issue presented, I must determine that the contract theory espoused by Kodak is viable—that Kodak has the right to decide what it will process and what it will turn away, as long as this policy determination is uniformly applied to all.

---

[1] After several conferences the parties agreed to exclude the antitrust issue from consideration by the court.

In mid-1978 Kodak, in the business of processing films submitted to it by the public, undertook a review of its policy concerning sexually explicit films submitted to its film processing laboratories. This policy review was activated by recent developments in obscenity law, beginning with *Miller v. California*, 413 *U.S.* 15, 93 *S.Ct.* 2607, 37 *L.Ed.2d* 419 (1973) and its statutory and decisional offspring. Kodak's chief concern then appeared to be the risk of criminal prosecution under applicable State and Federal laws and the damage to its business reputation and good will which would result from the filing of charges under these statutes, whether or not the likelihood of conviction was present.

Kodak then determined, in the exercise of its own independent business judgment, to adopt a policy not to return film submitted to it in a customer order which fell within the "*Miller*-defined" categories. Once determined, such policy was made an express part of Kodak's Service Manual. The policy statement reads in pertinent part:

"Pictures depicting the following types of conduct will not be returned to customers by Kodak when they are discovered during the work performed in completing a customer order:

     \*      \*      \*      \*      \*      \*      \*      \*

2. Masturbation, excretory functions or lewd exhibition of genitals." [2]

This policy statement, with standards for implementation, was provided to the Service Department's supervisory personnel in Kodak's ten processing laboratories, since they would have primary responsibility for seeing such policy was applied reasonably, objectively and uniformly according to the standards provided, albeit that standard differed from the standards set down in *Miller*.

On or about July 20, 1979, plaintiff submitted to Kodak's Fair Lawn laboratory an order for processing containing some 2,000 Kodachrome exposures. During the processing, the film was

---

[2]Kodak could well have said "blatant exhibition of female genitalia" since the contract theory does not require the standard of "lewd".

found by Kodak standards, to depict varying degrees of sexually explicit conduct and/or "lewd exhibition of genitals" and, according to policy directives, these transparencies were delivered to the Service Manager for examination. When judged by the standards he had been instructed to apply, the Service Manager found 285 of the transparencies to fall within the categories of "lewd exhibition of genitals and/or masturbation" as specified in the policy statement,[3] whereupon the 285 transparencies were withheld from the Penthouse order. The remainder of the order was forwarded to Penthouse's dealer, with a written notice as to the number of transparencies withheld and the reason therefor.

Kodak was contacted on August 6, 1979, by Joseph M. Kraft, then Vice President and General Counsel for Penthouse, with respect to these 285 withheld transparencies. Upon Kraft's representation that plaintiff was unaware of defendant's policy regarding sexually explicit film, and upon agreement that he would personally accept delivery of the withheld transparencies at the Fair Lawn laboratory, and that he would sign a written notice acknowledging he had been informed of Kodak's policy, Kodak agreed to return the film. On August 8, 1979, Kraft did, in fact, take possession of the withheld transparencies and executed a written notice of acknowledgment. On August 9, 1979, McClasky of Kodak's Corporate Legal Department provided Kraft with a detailed explanation of Kodak's policy, the reasons for instituting such policy, and the legal and business ramifications of the *Miller* decision with its statutory and decisional outgrowth in this area.

On August 21, 1979, plaintiff submitted to Kodak's Fair Lawn laboratory 42 rolls of film containing approximately 1,500 exposures, 239 of which were adjudged by the same process to depict subject matter falling within the same two categories specified in the aforementioned policy statement. Accordingly, the 239

---

[3]Plaintiff, in its affidavit, admitted that two of these photographs were perhaps unacceptable for publication in their unedited form.

were withheld from the return order which contained, once again, a written notice specifying the number of transparencies withheld and the reasons for same. The same process was repeated again in orders submitted by plaintiff on or about March 10, 1980, and March 13, 1980, wherein 53 transparencies were withheld by Kodak from development orders.

Defendant argues that Penthouse, having full knowledge of Kodak's policy regarding pictures depicting specified sexual conduct and its implementation of such policy, has accepted and become bound by the terms, conditions and limitations of the contract. The court agrees. 1 *Williston, Contracts* (3 ed. Jaeger 1957), § 90A–90D at 291–317. *Atlantic Pebble Co. v. Lehigh Valley R. R. Co.*, 89 *N.J.L.* 336, 342–343 (E. & A.1916). Full and actual knowledge of implementation of policy is evidenced by acknowledgment by plaintiff of receipt of written policy notice when the 289 transparencies previously withheld were returned to plaintiff on or about August 8, 1979. With knowledge of the limitations and conditions Kodak had imposed on its film developing services, plaintiff continued to submit orders to Kodak for processing. Kodak, acting pursuant to the terms and conditions of its undertaking, found such transparencies to depict "lewd exhibition of genitals" within the meaning of said contractual limitations, and withheld 292 transparencies from these two orders.

The court finds that plaintiff's submission of film processing satisfies the requirement of contractual assent and constitutes acceptance of Kodak's limited and conditional undertaking. Plaintiff argues Kodak was aware of its stance with regard to the withholding of transparencies and, therefore, Kodak's development of further orders constituted a counteroffer. This position cannot be sustained. To do so would merely require return of the slides and a restatement of policy by Kodak, placing the parties in the identical juncture they are now in. If the transparencies at issue were reasonably and in good faith withheld because they were reasonably determined by Kodak to depict

subject matter falling in a category specified in its express policy notice, plaintiff cannot complain, for it has by contract relinquished its right of possession to these transparencies; *i. e.*, the contract between Kodak and Penthouse gave Kodak the right to withhold the transparencies—the offeree is bound by the conditions of the offer he accepts. *Fox v. Haddon Township*, 137 *N.J.Eq.* 394 (Ch.1945):

" * * * the law permits men to make contracts which will result in forfeitures or a waiver of the return of money or property and, when no special equity calling for relief is established and it is clear from the terms of the contract that the parties have so agreed, a court of equity will not interfere to substitute a different and more liberal agreement." [at 398].

No doubt there was a contract; no doubt Kodak "reasonably determined" there was a violation of its standard; no doubt plaintiff anticipated this action. That Kodak acted reasonably and in good faith in determining that the withheld transparencies fell within the category of "lewd exhibition of genitals" expressly specified in its written notice is established by comparing the types of pictorial representations found to fall within this category by post-*Miller* courts and the images found on the withheld transparencies at issue. *People v. Gould*, 60 *Ill.2d* 159, 324 *N.E.2d* 412, 413, 415 (Sup.Ct.1975); *Raymond Heartless, Inc. v. State*, 401 *A.2d* 921, 925–926 (Del.Sup.Ct.1979); *City of Belleville v. Morgan*, 60 *Ill.App.3d* 434, 17 *Ill.Dec.* 558, 563–64, 376 *N.E.2d* 704, 709–710 (App.Ct.1978); *Penthouse International, Ltd. v. McAuliffe*, 610 *F.2d* 1353, 1372 (5th Cir. 1980), *Petition for certif. filed*, 447 *U.S.* 931, 100 *S.Ct.* 3031, 65 *L.Ed.2d* 1131 (1980).

Although the court is not unduly impressed with Kodak's concern over its image as a "family business" in light of transparencies it has chosen to accept for processing over the years versus those it has rejected, the court must affirm Kodak's right to make a reasonable determination, pursuant to written notice of policy, to reject those it finds violates such policy.

Plaintiff queries: Assuming the acts of Kodak are reasonable, is not Kodak protected by the theory of "editorial process" that these films are part of a preliminary work product, with the risk

on plaintiff and Kodak thus indemnified. This is an intriguing and novel argument which plaintiff makes, that Kodak is merely "a link in the editorial process". [*Transcript*, April 17, 1980, p. 71, lines 3–4]. Plaintiff says defendant should have been aware at the time of the seizures that the development process was only one step in the editorial process of Penthouse. Plaintiff in this legal thrust, in effect, seeks a declaration that such film is not obscene as a matter of law, as part of the editorial process, that the only reasonable interpretation of defendant's policy is that it does not bar return of photographs which are constitutionally protected. Defendant responds that film sent to it are individual pictures, not within a particular context, and they cannot be assured as to the context in which they will be displayed. Notwithstanding this, no determination of obscenity under the *Miller* standard is made by Kodak, nor does this court reach this issue in its decision. Also immaterial is the nature of the context into which the transparencies will finally be incorporated. Kodak simply looks to see if elements exist in the subject matter which are violative of their policy directives. A *Miller* violation is not before this court. Whether in adjudicating liability under a State or Federal obscenity statute a trier of fact, applying community contemporary standards, would find the three prongs of *Miller* violated is immaterial to the determination of the contractual issue before this court.

Plaintiff argues violation of First Amendment rights. The court asks, where is the State action, the infringement, actual or potential, of any right of Penthouse protected by the First Amendment? Defendant does not censor or restrict what plaintiff may publish; and no State action is involved. The policy adopted by Kodak is neither authorized nor required by any State or Federal obscenity statute. Here private parties contract, and breach of contract can be the only cause of action available. Kodak's policy lies exclusively in the field of private commercial transactions to which the doctrine of State action has not been extended. Plaintiff fails to demonstrate how Kodak's exercise of its own indepedent business discretion or

"business judgment" as to the circumstances under which it will do business, with proper notice, denies plaintiff of any First Amendment rights. It cannot be said that plaintiff's right to publish entitles it as a matter of law to dictate the terms and conditions under which it will accept the services of a private commercial entity and to deny that private business entity any right to independent business judgment associated with these services unless plaintiff agrees with such policy determination. The constitutional right of which plaintiff speaks is the constitutional right to publish its magazine, not as extended by plaintiff, that Kodak is constitutionally obligated to do its processing. There being an elective right on Kodak's part to process or not, it may do so on its own terms, providing the standards imposed are applied objectively and uniformly.

> "It has long been recognized that a manufacturer has the right to select its customers and to refuse to sell its goods to anyone for reasons sufficient to itself." [*Southern Distributing Co., Inc. v. Southdown, Inc.*, 574 F.2d 824, 827 (5th Cir. 1978)]. See also, *Unibrand Tire & Product Co., Inc. v. Armstrong Rubber Co.*, 429 F.Supp. 470 (N.Y.1977); *Lamb's Patio Theatre, Inc. v. Univ. Film Exchanges, Inc.*, 582 F.2d 1068 (Ill.1978).

Further, plaintiff's constitutional right to publish does not afford it the absolute right to demand the "best processor". There are alternatives available to it; for example, installation of its own film processing facility with a Kodachrome film processing license, or the use of independent processing laboratories, assisted by Kodak specialists in the field, or other readily available laboratories equipped to process Kodachrome film, should plaintiff take exception to Kodak's policy. Defendant had also presented evidence that Ektachrome film and processing, widely utilized by professional photographers, is capable of producing results at least comparable to Kodachrome film for the needs of Penthouse. Plaintiff's preference for Kodak Kodachrome film and processing may not and cannot restrict Kodak's right to conduct its own business undertakings as it deems appropriate to the best of its business judgment.

> "In the absence of any purpose to create or maintain a monopoly, the [Sherman] act does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent

discretion as to parties with whom he will deal. And, of course, he may announce in advance the circumstances under which he will refuse to sell." [*United States v. Colgate Co.,* 250 *U.S.* 300, 307, 39 *S.Ct.* 465, 468, 63 *L.Ed.2d* 992 (1919)].

Kodak's worry about criminal prosecution arising from the return to Penthouse or to professional photographers that which is to be considered for inclusion in plaintiff magazine does not impress the court, on the one hand because of the Government's reluctance to intervene in the case and, on the other, because of the willingness of Penthouse to indemnify Kodak of all responsibility in the "editorial process". For the purpose of this litigation, the court will assume either that the photographs are not "obscene" or that, if obscene, the processing thereof for Penthouse would not subject Kodak to possible criminal violations (*i. e.,* the "editorial process" theory)—the standard which Kodak may impose (aside any antitrust aspects) need not be the *Miller* standard. It may be a lesser standard reasonably and uniformly imposed to maintain a "family image".

In that the issue of obscenity is immaterial to a resolution of this matter, and the fact that the withheld transparencies fall within the contractual limitations of Kodak's policy (*i. e.,* they depict "lewd exhibition of genitals") and the material issues are solely ones of law, namely the construction of defendant's contractual conditions and whether the withheld transparencies are within such specified categories, defendant Kodak, therefore, is entitled to summary judgment as a matter of law and any claim for damages against Kodak on this narrow theory must fall. The Court, however, sees both the crossmotions for summary judgment as seeking direction—to test what the court is deciding today. That test over, and standards having been established, all transparencies retained by Kodak may be returned to Penthouse without prejudice. Kodak may, however, pursuant to its corporate policy, hereafter retain and destroy any transparency submitted to it by Penthouse as per the standards incorporated in its policy.

A judgment declaratory in nature will be entered in accordance with the above. No costs.