## APPENDICES NOT INCLUDED FOR PURPOSES OF PUBLICATION

Anthony P. SGRO, Plaintiff,

v.

GETTY PETROLEUM CORP., Defendant.

Civ. A. No. 91–2007 (MLP).

United States District Court, D. New Jersey.

June 17, 1994.

[271.] As noted, in order to be entitled to bail pending appeal, Bertoli must also establish "that the appeal is not for the purpose of delay...." *Messerlian*, 793 F.2d at 95. In light of the issues Bertoli has designated for appeal, all of which are patently unmeritorious, there is a strong probability that his appeal is intended for the purpose of delay. In fact, throughout these proceedings, Bertoli has attempted to prolong and delay the disposition of his case whenever possible. Examples of such conduct include, but are not limited to Bertoli's application for the Cayman Islands *Ex Parte* Injunction, *see supra;* at 998, his constant and frivolous objections and motions relating to documents and testimony from the Cayman Islands Depositions and his repeated baseless attempts at obtaining recusal.

Bertoli has, in fact, employed similar tactics at other times when he has faced civil or criminal liability. *See, e.g., supra*, at 1120 (Bertoli baselessly attempted to obtain recusal of Judge Tracy, who was presiding over the 1975 SEC Proceedings, and baselessly demanded the indictment of Judge Lacey and Judge Stern while under investigation by a Federal grand jury in 1977). For example, the record reflects that during his prosecution on the 1977 Indictment, Bertoli, representing himself, engaged the court in a suppression hearing which lasted "forty-something trial days." Rule 104 Hearing Tr. at 8.

In light of Bertoli's history of attempting to put off judgment through delay tactics, there is a strong likelihood that the instant appeal is similarly aimed at delaying the proceedings. Such a likelihood precludes the grant of bail pending appeal. *See Messerlian*, 793 F.2d at 95.

[272.] The decisions reflected in this opinion were reached on or before 28 March 1994. Cite-checking, editing, printing and duplicating were not completed, however, until 30 March 1994. Accordingly, while the opinion was filed 30 March 1994, it is dated 28 March 1994.

Gary E. Fox, Ocean, NJ, for plaintiff.

William D. Grand, Greenbaum, Rowe, Smith, Ravin & Davis, Woodbridge, NJ, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

PARELL, District Judge.

### I. *INTRODUCTION*

This is an action in which plaintiff Anthony P. Sgro ("Sgro") sues defendant Getty Petroleum Corp. ("Getty") seeking specific performance of an alleged contractual obligation to remove underground petroleum tanks located on Mr. Sgro's property, and seeking damages for alleged breach of contract and tortious interference with plaintiff's actual and/or prospective economic advantage. Defendant counterclaims for damages from plaintiff in the amount of increased removal costs, in the event that plaintiff is granted specific performance.

This Court has jurisdiction pursuant to 28 U.S.C. § 1332 based upon diversity of citizenship between plaintiff, a resident of New Jersey, and defendant, a Delaware Corporation having its principal place of business in New York. The amount in controversy ex-

clusive of interest and costs exceeds $50,000. The following are the Court's findings of fact and conclusions of law following a non-jury trial, pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## II. *FINDINGS OF FACT*

Plaintiff owns property ("the property") located at 845 Broadway in West Long Branch, New Jersey. He purchased the property in or about June, 1985. The prior owner had leased it for a number of years to Getty (and its predecessors and sub-tenants) for use as a Getty gas station, and when Sgro acquired the property it contained various items of equipment owned by Getty including signs, gas pumps, a tire machine, an in-ground lift, and several underground storage tanks ("the tanks"). Shortly after acquiring the property, Sgro entered into an oral arrangement with Getty whereby the property would be supplied with Getty petroleum products, and would be operated as a Getty service station by plaintiff. In connection with that arrangement the parties entered into a written Equipment Loan Agreement (Ex. J–1)[1]. A Dealer Supply Contract (Ex. J–4) and other proposed contracts were prepared at that time, but were never executed by the parties.

The items of equipment owned by Getty at the property, including the underground tanks, were used by plaintiff subject to the terms and conditions of the Equipment Loan Agreement. That Agreement provided that upon the expiration or other termination of the agreement, plaintiff was obligated to return Getty's equipment to it. The Equipment Loan Agreement also provided the following with respect to Getty's rights in the equipment at termination of the Agreement:

If the Equipment is not sold by Company to Operator, a succeeding supplier of petroleum products, or to any other party, then Company may without notice to Operator enter at any time upon the Station or

any other premises of Operator and take back said equipment; ...

(Ex. J–1 ¶ 3(b).)

Plaintiff and his family and persons hired by them operated the property as a Getty station from on or about July 1, 1985 until approximately October, 1987, when plaintiff stopped operating that business and closed the Getty station. Plaintiff apparently continued to operate the adjacent property, an auto body shop which he had owned and operated for 30 years.

On November 2, 1987 plaintiff's attorney, Gary Fox, Esq., sent a letter to Getty requesting that it remove its equipment from the property as soon as possible. (Ex. J–11.) That letter further stated:

We also request that you have the soil tested and provide to us certificate stating that the soil is clean, in accordance with all EPA and ECRA environmental standards. We would also request that you repair any holes in the pavement, which the removal of the aforementioned may create by filling the holes with clean sand, trap rock and covering same with an appropriate cover of black top consistent with the black top in the surrounding area.

(Ex. J–11.)

Following receipt of that letter, Getty promptly began the preparations for removing the equipment by issuing a work order on November 20, 1987, (Ex. J–17), to Lombardo Equipment Company ("Lombardo"), an independent contractor. Before Lombardo commenced performance on the job, however, plaintiff himself orally contacted Getty and told Getty that he continued to be interested in leasing the property as a gas station, either to Getty or to another company. Plaintiff thereafter negotiated with various entities, including Getty, Globe Petroleum Co. ("Globe") and Century Oil U.S.A., Inc. ("Century").[2] Getty accordingly instructed Lombardo to await further instructions regarding removal of the equipment.

---

**1.** All exhibit references are to exhibits which were received in evidence at trial.

**2.** The course of those various negotiations was presented at length by the parties in the trial

testimony and exhibits, and will be referred to here in summary as well as in later sections of this opinion.

As of March, 1988 plaintiff's negotiations with Getty were not reaching fruition; his negotiations with Globe had ended; and Century had indicated to plaintiff and to Getty that it would want Getty's equipment removed if it leased the property. Getty therefore revived its preparations to remove the equipment, including the underground tanks, by issuing a Request for Bid, (Ex. J–39), which again resulted in Getty engaging the Lombardo firm to perform the removal. The work was scheduled to begin on March 11, 1988. However, when the Lombardo crew arrived that day, plaintiff only permitted Lombardo to remove the signs and gas pumps, and would not discuss the scheduling of a date for the contractor to remove the rest of Getty's equipment. (Ex. D–1 and testimony of Adel Hreiz and Thomas Lombardo.)

On May 23, 1988 Edward Delaney, Getty's Field Sales Manager, wrote to plaintiff's attorney, Gary Fox, Esq., stating that since Mr. Sgro had refused to discuss further equipment removal directly with Getty representatives, Getty was requesting through Mr. Fox's office "a date when all equipment may be either removed or sold to Mr. Sgro." (Ex. J–6.) In response, Mr. Fox wrote to Getty on August 29, 1988, stating *inter alia* as follows:

> [P]lease be advised that client is requesting that you remove all of the fixtures on the property by two weeks from today's date, including gas tanks, light posts, signs, in ground lift and air compressor.
>
> In addition, we are going to require that you provide us with a certification, consistent with federal law, that the property is in a "clean state" after removal of the gas tanks.

(Ex. J–8.)

The same letter also discussed a dispute which had arisen between the parties concerning a balance due to Getty in a stated invoice amount of approximately $1,900. Further, the letter stated:

> We have a prospective tenant that is interested in leasing the property as of September 1, 1988. In fact, as a result of the problems that you caused for us with Century Oil, the property has been off the market since November of 1987. We believe that your company has some responsibility with regards to this loss of income and once you have attended to removing the fixtures from the property so that we can lease the property, I do want to clear up your invoice as well as the damages that we have substained (sic) as a result of the delays.

(Ex. J–8.)

A further exchange of correspondence took place between Getty and Mr. Fox in September and early October, 1988 regarding the accounts receivable dispute and the time for removal of the remaining equipment. (Exs. J–7, J–9, J–10 and J–43.) As of the approximate date of October 10, 1988 the accounts receivable matter was resolved by taking a stick reading of the gasoline remaining in the tanks on the property, and giving plaintiff credit for that amount against his balance due to Getty. Also in that exchange of correspondence, Getty advised Mr. Fox that it had tentatively scheduled the tank removal for October 17, 1988. (Ex. J–43.)

While these communications were ongoing between Getty and plaintiff's attorney, Mr. Fox, plaintiff himself sent a letter dated October 10, 1988 to the President of Getty, Mr. Leo Liebowitz, in which he stated, *inter alia:*

> If your decision is to remove the tanks, then this must be done immediately (our first request was made in November to remove these tanks) failure to do this has resulted in the loss of several opportunities to lease the property. (sic)
>
> A decision to remove the tanks under the following terms must be confirmed in writing before any work is done.
> —soil tested, and certified by the State Department
> —clean fill replaced
>
> .  .  .  .  .
>
> —eight inches of stone on top of the clean fill
> —asphalt base coat and after settling, finish coat of the entire premises.
> —replacement of the loss of rental income from the time of the notification to your office to remove them, at the rate of

$3,600 a month up to the date of their removal

(Ex. J–26.)

This letter also described a number of problems plaintiff had been having with Getty, which plaintiff attributed to Mr. Delaney, and concluded as follows:

> I hope that we can avoid legal action and reach a mutually satisfactory agreement. This property was purchased with the intent of continuing to lease it at fair market value and this remains our primary concern. The location is an excellent one and with modern equipment it will be a high volume station and as such, would prove mutually profitable to both our interests and save considerable tank removal fees and legal fees in the process.

(Ex. J–26.)

After receiving and reviewing plaintiff's letter of October 10, 1988, Getty continued to prepare for the tank removal tentatively scheduled for October 17, 1988 as had been previously stated in Getty's correspondence to Mr. Fox dated September 27, 1988, (Ex. J–43.) Getty made these plans based upon its view that it had the right under the Equipment Loan Agreement to remove that equipment, and that it was under no obligation to enter into a further written agreement with Mr. Sgro with respect to the equipment removal. Accordingly, and with prior oral notice to plaintiff, on October 18, 1988 Getty dispatched its contractor, Lombardo, to the property with the heavy rigs and cranes to remove the underground tanks. Plaintiff refused Lombardo entry to the property and prevented removal of the tanks on that day. Plaintiff also corresponded with Getty on the same day, October 18, 1988, stating in part as follows:

> Today a crew from Getty Petroleum arrived at our premises ... with the intent of removing the underground storage tanks. However, as it was previously agreed, both verbally and instructed in writing on two occasions. (sic) The most recent being our letter of October 10, 1988 Federal Expressed to your office, no work is to be begun until the terms of the removal are clearly defined in writing by your office as stipulated in our letter referenced above.

> .   .   .   .   .

> Failure to provide a written agreement for the underground tank removal raises the question of the integrity and the intent of the company representatives involved.

> .   .   .   .   .

> No tank removal will be permitted without the promised written agreement.

(Ex. J–27.) [3]

Getty replied to plaintiff's letter of October 10, 1988 by letter dated October 31, 1988 to Mr. Sgro from Getty's Regional Manager, L.J. Gregus. That letter stated in part:

> Getty ... has made every effort to negotiate a lease or dealer contract with you to continue supplying Getty products to the (property). Having failed to come to terms, and at your request, we have been attempting to remove the underground storage tanks. Numerous communications between Getty personnel, you and your attorney Mr. Fox have resulted in your steadfast refusal to allow us on the property.

> Please be advised that Getty ... is ready to remove the tanks in accordance with the requirements of the law. In addition, we are still willing to negotiate in good faith to brand and supply the facility as a Getty station within terms equitable to both parties.

(Ex. J–15.)

There was uncontroverted evidence produced by Getty that in New Jersey in 1988, when these communications were being exchanged between Sgro and Getty, the demands of plaintiff concerning the procedure for removing such underground tanks were

---

**3.** The Court finds that there is no evidence that Getty entered into, or promised to enter into, a "written agreement for the underground tank removal." The references in the letter dated October 18, 1988, (Ex. J–27), and in plaintiff's earlier letter dated October 10, 1988, (Ex. J–26), demanding such a written agreement were just that—demands—to which Getty neither "stipulated" nor "agreed" in writing or orally. Plaintiff confirmed on cross-examination at trial that Getty did not ever agree to any conditions to its right of removal.

not within the bounds of what was customary or required under law. The customary and accepted procedure at that time, which Getty did contract with Lombardo to provide, was to remove the underground tanks, remove and dispose of any visible contamination in the excavation, fill the excavation with clean fill, and place an asphalt coat over the area of excavation. There was no local, state or federal requirement of soil testing, and no certification by the New Jersey Department of Environmental Protection or any federal agency was required. Thus, the Request for Bid, upon which the job was awarded to Lombardo, specified that the removal and disposal of the tanks was to be performed "in a legal manner in accordance with N.J.D.E.P. regulations." (Ex. J–39.) The Scope of Work stated that the property would be restored and paved and that all work was to be "in accordance with local and state regulations." (Ex. J–39). Similarly, at the time there was no custom or requirement that eight inches of stone be installed over the clean fill, or that the entire premises be repaved after tank removal. Getty specifically represented to him in the letter of October 31, 1988 that Getty stood "ready to remove the tanks in accordance with the requirements of the law." (Ex. J–15.) Plaintiff testified that he never asked Getty or his own attorney, Mr. Fox, what was usual and customary in the trade, or legally required under federal, state or regulations, and that his demanded conditions for tank removal were based only upon his own "common sense" ideas of what should be done.

Plaintiff made no further demands upon Getty to remove the tanks between October 18, 1988 and July of 1989. Instead, during that period, plaintiff continued to pursue the prospect of negotiating a lease of the property, with tanks, to Getty or to Century. The negotiations with Getty were still in progress when, on July 6, 1989, Sgro wrote to Getty requesting another lease proposal and stating as follows:

> If a mutual agreement cannot be made within five days—REMOVE THE TANKS.
>
> Please sign and return the enclosed stipulation of removal. (Originally sent you on (sic) October, 1988). As stated before, removal will not be permitted until we have the attached in writing. This is absolutely necessary since your organization has lost all credibility with us.

(Ex. P–2.)

The attachment to that letter was a one-page proposed agreement entitled "Terms of Tank Removal", with a signature line for an authorized representative of Getty to sign, containing the same features as those described in plaintiff's previous letters of October 10, 1988 and October 18, 1988, (Ex. J–26 and J–27), except for the demand for damages, to wit:

1. Remove all underground storage tanks.
2. Test soil and provide authorized certification that it is clean.
3. Replace clean fill.

   .     .     .     .     .

5. Provide eight inches of stone on top of the clean fill.
6. Apply asphalt base coat, and after settling, finish coat of entire premises.

(Ex. P–2.)

Plaintiff's letter of July 6, 1989 was contemporaneous with a letter to plaintiff from Getty dated July 7, 1989 (Ronald Grabarek, Manager of Real Estate for the Newark District), which contained another lease proposal from Getty. (Ex. J–14.) Mr. Sgro considered that proposal and rejected it in a letter dated July 24, 1989 to Mr. Liebowitz, the President of Getty, which stated in full:

> We have reviewed your last contract offer and it is totally unacceptable. This reinforces our feeling that your company has a negative attitude towards small business.
>
> Please remove your tanks immediately. Further delays will not be tolerated. This is the third request to have these tanks removed.
>
> It is necessary, however, to sign and return the terms of removal agreement that is attached prior to doing any work. The terms of this agreement are not unreasonable, therefore we expect them to be

signed and returned within three business days.

(Ex. J-30.)

The attachment to that letter was the same one-page "Terms of Tank Removal" sheet which had been attached to Sgro's previous letter of July 6, 1989.

Getty next proceeded with another round of lease negotiations with plaintiff, in which plaintiff actively participated without insisting upon the deadline for tank removal set forth in his letter of July 24, 1989. Those negotiations also involved plaintiff's real estate attorney, Brian Smith, Esq., who reviewed and "marked up" a proposed form of lease while the negotiations were in progress. As of early September, 1989, Getty rejected plaintiff's rental amount demand as being too high, and those negotiations with Getty ended. Mr. Sgro thereupon wrote to his attorney on September 7, 1989 instructing him as follows:

> Enclosed please find a list of conditions I want for the removal of the tanks on my lot by Getty Petroleum. Please look over those conditions and if you do not have any changes, fax them along with a letter to Getty Petroleum telling them to get their tanks out immediately. I want Getty to sign the conditions of tank removal before I will allow them to start removal.

(Ex. J-25.)

Mr. Smith then sent a letter dated September 7, 1989 to the President of Getty, enclosing a form of written agreement and stating in part as follows:

> Please be advised that our client demands that your company remove from the referenced premises its presently existing underground storage tanks, pursuant to a written agreement to be entered into between your company and our client in the form enclosed herewith. This agreement must be entered into prior to the commencement of the removal of the tanks.

·   ·   ·   ·   ·

Once this agreement has been duly executed, we will require that you remove all of the tanks in a manner consistent with applicable federal and local law and that you provide us with a certification that the property is in a "clean state" after the removal of the tanks.

(Ex. J-34.)

The list of terms regarding the tanks contained in the attached "agreement" was the same as in the "Terms of Tank Removal" attachments to plaintiff's earlier two letters of July 6, 1989 and July 24, 1989, (Ex. P-2 and J-30). In addition, the proposed "agreement" concluded:

> All of the foregoing work shall be performed by Getty or by its contractors in a good and workmanlike manner and in accordance with all applicable federal and local law; it being agreed that Getty Petroleum Corporation is responsible for any environmental clean-up of the site necessitated by the existence of or removal of the underground storage tanks.

(Ex. J-34.)

Getty did not respond to that demand, and on October 3, 1989, attorney Smith wrote to Mr. Liebowitz, President of Getty, stating in pertinent part as follows:

> [U]nless we hear from you immediately with respect to the foregoing underground storage tanks, please be advised that our client will remove the tanks and dispose of them as abandoned property. In addition, our client will hold you responsible for the cost of tank removal as well as for all costs expenses and damages suffered by it in connection with this matter.

(Ex. J-35.) [4]

Getty received no further communication from or on behalf of plaintiff regarding tank removal after Mr. Smith's letter of October 3, 1989. This action was filed by plaintiff in the Superior Court of New Jersey, Chancery Division, on March 15, 1991, and was subsequently removed by defendant to this Court

---

4. Plaintiff testified at trial that this letter by attorney Smith was not authorized by him. The Court does not need to make a finding on this point, but observes that the letter was sent by certified mail, with copies to plaintiff, as well as to Gary E. Fox, Esq. of Mr. Smith's law firm (also counsel to plaintiff); and also that the letter was never revoked or repudiated by any of them prior to the litigation.

on May 2, 1991. The tanks and related equipment have not been removed from the property to date.

Defendant produced undisputed evidence that the cost to remove the tanks in 1988 was $16,500 plus any costs associated with clean-up if contaminated soil was found; whereas the cost to remove the tanks in 1993 was approximately $30,000 to $40,000 plus any costs associated with clean-up of the soil if contaminated. There was also evidence that in the years since 1988, regulatory compliance requirements for removal of such tanks and environmental remediation of the excavation site have substantially increased.

## III. DISCUSSION

Count One of the Complaint seeks specific performance of Getty's alleged obligation to remove the underground tanks in the manner specified by plaintiff. Counts Two, Three and Four of the Complaint seek damages from Getty in the form of rental value allegedly due to plaintiff on theories of breach of contract (Count Two), tortious interference with prospective economic advantage (Count Three), and interference with contractual relationships (Count Four). The amount of damages claimed on those counts is $188,000. *See* discussion *infra* section III.B. The Answer contains a counterclaim for damages relating to plaintiff's refusal to allow the tanks to be removed, in the event that specific performance is granted on Count One of the Complaint. The amount of the counterclaim is the difference between the cost of removal in 1988 and the cost at present.

The substantive law of New Jersey is applicable in this diversity action, based on the location of plaintiff, the property, and the fact that many of the events relevant to this action took place in the state of New Jersey. *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Each of the parties bears the burden of proving their respective claims. *See Michael Halebian N.J., Inc. v. Roppe Rubber Corp.,* 718 F.Supp. 348 (D.N.J.1989); *Raymond v. Cregar,* 38 N.J. 472, 185 A.2d 856 (1962); *Weisbrod v. Lutz,* 190 N.J.Super. 181, 462 A.2d 610 (App.Div.1983); *Kurtz v. Oremland,* 33 N.J.Super. 443, 454–55, 111 A.2d 100, 107 (Ch.Div.), *aff'd,* 16 N.J. 454, 109 A.2d 286 (1954).

### A. *The Claim for Removal of the Tanks*

Plaintiff asserts that under the terms of the Equipment Loan Agreement, (Ex. J–1), Getty is obligated to remove the tanks and related equipment. (Pl.'s Trial Br. at 6.) Plaintiff also asserts that Getty is the owner of the tanks, and for that reason also Getty should be required to remove them. (*Id.*) These are related but not identical theories, which will be addressed here in sequence.

#### 1. *Obligations of the Parties under the Equipment Loan Agreement*

It is well settled that where the terms of a written contract are clear and unambiguous, the contract must be enforced as it is written. *Levison v. Weintraub,* 215 N.J.Super. 273, 276, 521 A.2d 909, 910–11 (App.Div.), *certif. denied,* 107 N.J. 650, 527 A.2d 470 (1987). Here, it is undisputed that Getty had been a tenant on the property before the property was acquired by plaintiff. When plaintiff bought the property and began operating it as a Getty service station, Getty allowed its equipment, including the pumps and tanks, to remain on the property and be used by plaintiff pursuant to the Equipment Loan Agreement dated July, 1985.

The terms of the Equipment Loan Agreement (hereafter "the Agreement") and the surrounding circumstances, indicate that the tanks and related equipment were loaned to plaintiff under an express agreement of bailment for mutual benefit. There is a well developed body of legal principles applicable to this species of contractual relationship. *See generally,* Words and Phrases Bailment (1968); 8 Am.Jur.2d Bailments (1980); 8 C.J.S. Bailments (1988). Those principles, as articulated in a long tradition of consistent case law developed in New Jersey and other states, are applicable in ascertaining the rights and obligations of the parties under the Agreement in this case.

A bailment contract, express or implied, is created when personal property is delivered by one person into the possession of another person in trust for a specific pur-

pose, under an agreement that the property will be returned to the owner, or accounted for, or kept for the owner to reclaim it, when the purpose is accomplished. *See generally,* 8 Am.Jur.2d Bailments § 1, *et seq.* The elements of "bailment" are delivery of personal property by one person to another in trust for a specific purpose, acceptance of such delivery, and express or implied agreement to carry out the trust and return the property to the bailor. *State v. Carr,* 118 N.J.L. 233, 192 A. 36 .(E. & A.1937); *Cerreta v. Kinney Corp.,* 50 N.J.Super. 514, 517, 142 A.2d 917, 919 (App.Div.1958); *Gilson v. Pennsylvania R. Co.,* 86 N.J.L. 446, 92 A. 59 (1914), *aff'd,* 87 N.J.L. 690, 94 A. 1102 (E. & A.1915); *see also Bill Bell, Inc. v. Ramsey,* 284 S.W.2d 244, 247 (Tex.Civ.App.1955). The word "bailment" is derived from the French word "bailler" meaning "to deliver"; and the objects or purposes of a bailment may be as various as the transactions of men. *State v. Carr,* 118 N.J.L. at 234, 192 A. 36. "In order to constitute a sufficient delivery of the subject of a bailment in any given case, it is the general rule that there must be such a full transfer, actual or constructive, to the bailee as to exclude the possession of the owner and all other persons and give to the bailee, for the time being, sole custody and control thereof." 8 Am.Jur.2d § 68; *see Cerreta v. Kinney Corp.,* 50 N.J.L. at 517, 142 A.2d 917; *J.L. Querner Truck Lines, Inc. v. Safeway Truck Lines, Inc.,* 65 N.J.Super. 554, 561, 168 A.2d 216, 220 (App.Div.), *aff'd,* 35 N.J. 564, 174 A.2d 201 (1961). The requirement of delivery may be satisfied where a person, in vacating the possession of real estate, leaves his chattels on the property with the permission of the successor in possession of the land. *Banks v. Korman Assoc.,* 218 N.J.Super. 370, 372–73, 527 A.2d 933, 934–35 (App.Div.1987); *see also* 8 Am.Jur.2d § 68 (citing *Beauchamp v. Leypoldt,* 108 Neb. 510,

188 N.W. 179 (1922)). The obligation to return the property received is the essential feature of a bailment since the purpose of a bailment contemplates the eventual return of the property to the owner. *State v. Carr,* 118 N.J.L. at 234, 192 A. 36; *Zuppa v. Hertz Corp.,* 111 N.J.Super. 419, 423, 268 A.2d 364, 366 (Essex County Ct.1970); *see also Farquhar v. McAlevy,* 142 Pa. 233, 21 A. 811 (1891).

All of the essential elements for creation of a bailment relationship are present in this case. As set forth in the Agreement, the tanks and related equipment were loaned by Getty to Sgro for the purpose of storing, handling and dispensing Getty products. (Agreement ¶ 1.) It was specified that the equipment was personal property owned by Getty:

> [T]he Equipment shall at all times remain the property of Company and shall at all times remain, be considered and treated as personal property and in no sense fixtures or part of the real estate regardless of the manner in which the same is or may be installed or placed on the Station.

(Agreement ¶ 2.)

The element of delivery was satisfied when Getty, as the former tenant, left the equipment on the premises by mutual agreement for Sgro to use after he bought the station.[5] Finally, the obligation of Sgro as bailee to return the equipment to Getty, or to otherwise make the equipment available to Getty, at the termination of the Agreement was clearly set forth therein:

> Upon the expiration or other termination of this Agreement: (a) Operator shall return the Equipment to Company in good condition and repair without loss or impairment of the Company's title, unless title thereto has been acquired by Operator from Company under an executed bill

---

5. The law recognizes various types of bailments and, although the particular type is not in issue in this case, it is clear that the bailment here was for mutual benefit. *See Nelson v. Fruehauf Trailer Co.,* 20 N.J.Super. 198, 89 A.2d 445 (App.Div. 1952), *aff'd,* 11 N.J. 413, 94 A.2d 655 (1953) (bailment for mutual benefit exists where the bailment is incidental to conduct of a business for which the bailee derives a profit, even if bailee receives no compensation for the bailment as such). *See also Rauber v. Zinner,* 125 N.J.L. 85, 13 A.2d 488 (1940); *Waggoner v. General Motors Corp.,* 771 P.2d 1195, 1199 (Wyo.1989) (bailment for mutual benefit exists if the lending is incidental to some other business transaction between the parties); *Matter of Ripley Oil Co., Inc.,* 71 B.R. 631, 632 (Bankr.S.D.Ohio 1987) (bailment for mutual benefit existed where oil tanks and pumps were loaned by petroleum distributor to farm customers as storage facilities for fuel sold by the petroleum distributor to the farm customers).

**1176**

of sale; (b) if the Equipment is not sold by Company to Operator, a succeeding supplier of petroleum products, or to any other party, then Company may without notice to Operator enter at any time upon the Station or any other premises of Operator and take back said Equipment; ....

(Agreement ¶ 3.)

Here, the express terms of the Agreement gave Getty the option to have Sgro return the equipment, or to have Getty go onto Sgro's premises and remove it, and the latter option was a valid contractual provision. *See, e.g., Umentum v. Arendt,* 267 Wis. 373, 66 N.W.2d 192 (1954) (the general rule requiring a bailee to redeliver the property to the bailor at the end of the term does not preclude the making of a contract under which the bailer agrees to call for the property when the bailment terminates).

■ A bailment contract is governed by the same rules of law that govern other contracts. *New York, L.E. & W.R. Co. v. New Jersey Elec. Ry. Co.,* 60 N.J.L. 338, 38 A. 828, 830, *aff'd,* 61 N.J.L. 287, 41 A. 1116 (E. & A.1897). Thus, as a general rule, the rights, duties and liabilities of the bailor and bailee must be determined from the terms of the contract between the parties. *Silvestri v. South Orange Storage Corp.,* 14 N.J.Super. 205, 210, 81 A.2d 502, 504–505 (App.Div.1951) (citing *Lebkeucher v. Pennsylvania Railway Co.,* 97 N.J.L. 112, 116 A. 323, *aff'd,* 98 N.J.L. 271, 118 A. 926 (E. & A.1922)). In interpreting bailment contracts, as with contracts generally, an express agreement will prevail against general principles of law applicable in the absence of express agreement. It is therefore improper to imply obligations except in the absence of express contractual terms. *Id.; see also On Site Energy Corp. v. Sperry Rand Corp.,* 5 Conn.App. 326, 498 A.2d 121, *certif. denied,* 197 Conn. 818, 501 A.2d 388 (1985). The language used by the parties in an express contract of bailment must be given its plain, everyday meaning,

taking into consideration the relation of the parties, their connection with the subject matter, the circumstances under which the contract was made, and the matter to which it relates. The words of the contract must be given a reasonable construction, and the language used is to be construed as it was understood and acted upon by the parties. *See generally* 8 C.J.S. Bailments § 31 and cases cited therein.

■ Paragraph three of the Agreement, quoted above, clearly placed the *obligation* upon plaintiff to return the equipment at termination of the contract, and correspondingly conferred upon Getty to *right* to take back the equipment at termination. The operative words of the latter clause are "[the] Company *may* without notice to Operator enter at any time upon the Station ... and take back said equipment." (Agreement ¶ 3) (emphasis added).[6]

There is nothing in the contractual language or the context of this case which supports plaintiff's contention that Getty was obliged by this contractual language to remove the tanks, or that plaintiff had the right to prevent their removal. To the contrary, the clear intention of the clause is that Getty had the right to remove the equipment at the termination of the contract, and plaintiff had the obligation to return it. This reading of the clause is consistent with the subject matter and context of the Agreement, which specifically addressed the loan of equipment belonging to Getty for installation and use on real estate owned by the Operator, Mr. Sgro. The clause was obviously directed, at least in part, to the very occurrence which did arise in this case, namely, the refusal of the property owner to allow Getty to send its people onto the property to retrieve Getty's equipment from the exclusive possession of the property owner. Undoubtedly, therefore, under the plain language of the Agreement, Getty had the right but not the obligation to

6. See *Black's Law Dictionary* (6th Ed.1990) def. "may": " * * * Word 'may' usually is employed to imply permissive, optional or discretional, and not mandatory action or conduct. * * * Regardless of the instrument, however, whether constitution, statute, deed, contract or whatever, courts do not infrequently construe "may" as "shall" or "must" to the end that justice may not be the slave of grammar. However, as a general rule, the word "may" will not be treated as a word of command unless there is something in context or subject matter of act to indicate that it was used in such sense. * * * [citations omitted].

remove its equipment from plaintiff's premises.

■ Plaintiff argues in reply that the conduct of Getty indicates that Getty did obligate itself to remove the equipment. In support of this argument plaintiff points out that Getty did remove part of the equipment in March of 1988; and that Getty attempted to remove the rest of it when it sent Lombardo back to the property on October 18, 1988; and that Getty stated its intention to remove the tanks in its letter of October 31, 1988. Conduct of the parties and course of dealing can be considered by a court in aid of interpreting a written contract. *Wheatly v. Sook Suh,* 217 N.J.Super. 233, 239–40, 525 A.2d 340, 344 (App.Div.1987); *Michaels v. Brookchester, Inc.,* 26 N.J. 379, 390, 140 A.2d 199 (1958). Here, however, the conduct of Getty was fully consistent with its stated position in this lawsuit, that, at the times in question, it was ready and willing to exercise its right to remove the tanks. Plaintiff has produced no evidence that any representative of Getty ever went beyond that stated position and undertook any obligation to remove the tanks. Significantly, Getty's only written comment to plaintiff on the issue of the tank problem was contained in the letter dated October 31, 1988 which merely stated:

> [W]e have been attempting to remove the underground storage tanks. Numerous communications between Getty personnel, you and your attorney Mr. Fox have resulted in your steadfast refusal to allow us on the property. Please be advised that Getty . . . is ready to remove the tanks in accordance with the requirements of the law.

(Ex. J–15.) These words fail to support plaintiff's argument that Getty acknowledged, in its actions or by its words, an obligation to remove the tanks.

■ Plaintiff's dispute with Getty during the period when Getty was attempting to remove the tanks was with respect to the manner of removal. Thus, during 1988 and 1989, plaintiff at various times communicated with Getty demanding that specified procedures be followed and that Getty agree in advance, in writing, to those procedures. Getty's reply, both orally and in writing, was that it was ready to remove the tanks in accordance with all legal requirements at the time. Plaintiff made no inquiry of Getty as to what Getty's intended procedure for removal would be.

Bailment agreements, like all agreements, are generally subject to statutory regulations and public policy. *See Silvestri v. South Orange Storage Corp.,* 14 N.J.Super. at 210, 81 A.2d 502 (citing *Lebkeucher v. Pennsylvania. R. Co.,* 97 N.J.L. 112, 116 A. 323); *see generally* 8 C.J.S. Bailments § 31. In addition, to the extent that the manner of redelivery of bailed goods is not specified in the contract, it has been held that the bailee's obligation is regulated by the custom and usage of business at the place where the bailment is made, such custom and usage being considered as a part of the contract. *New York & New Brunswick Auto Express Co. v. Massachusetts Bonding and Ins. Co.,* 67 N.J.Super. 401, 403–404, 170 A.2d 519, 520 (Law Div.1961); *see generally* 8 C.J.S. Bailments § 87 (citing *Clarke v. Bohemian Breweries,* 7 Wash.2d 487, 110 P.2d 197 (1941) and *Batesville Gin Co. v. Whitten,* 96 Miss. 210, 50 So. 695 (1909)).

Witnesses produced by Getty, including the contractor Lombardo, testified at trial that Getty had ordered that the usual and customary procedures for proper and legal tank removal were to be followed by Lombardo in performing the work on plaintiff's property. The Agreement certainly required no more and, in fact, was silent on the methods for removal of the equipment by Getty. Thus, the common law standard was the only one which possibly could have applied in the ongoing contractual dispute between the parties regarding the procedure for the tank removal.[7] There was no evidence produced by plaintiff that there was any prevailing

---

7. It must be pointed out that the present litigation does not address what if any obligations either or both of the parties may currently have for site cleanup remediation under current federal or state environmental protection laws. To the extent that such laws shift or increase the contractual and common-law duties of the parties, those laws are beyond the scope of the pleadings and the proofs presented in this case.

custom or practice in 1987 through 1989 which would have required the "Terms of Removal" upon which plaintiff insisted. It is not sufficient for plaintiff to argue, as he does, that his demands were reasonable and therefore should have been acceded to by Getty, without any evidentiary support for the argument. Defendant on the other hand produced evidence that the terms demanded by plaintiff were unfounded in custom or in applicable legal standards for removal of such tanks at the time.

The Court is constrained to find, upon the record before it, that plaintiff has failed to sustain his burden of proof that either (a) Getty had a contractual obligation to remove the tanks; or (b) Getty had an obligation, if it did exercise its right to remove them, to perform the work in any manner other than what was usual and customary practice at the time. It follows that Getty was similarly under no obligation to enter into a new written agreement with Sgro setting forth the terms and conditions of tank removal. The law will not normally make a different or better contract for the parties than that which they have entered into. *Weinstein v. Sheer*, 98 N.J.L. 511, 512–13, 120 A. 679, 681–82 (E. & A.1923).

Plaintiff further argues that his motivation in seeking a written agreement from Getty prior to allowing them to commence tank removal was that he had developed a mistrust of Getty based on prior disappointing experience with the company. He had become concerned that Getty would come onto the property, open up the ground, remove the tanks, and then, having found contamination, walk away from the problem, leaving plaintiff with all the work and expense of the clean-up. (Pl.'s Trial Br. at 9.) This fear was reflected in plaintiff's various demand letters to Getty, culminating in that of attorney Smith's proposed "agreement", which was sent with his letter of September 7, 1989 to Getty's President and which ended with the following proposed clause: "... it being agreed that Getty ... is responsible for any environmental clean-up of the site necessitated by the existence of or removal of the ... tanks." (Ex. J–34.)

Plaintiff's attempt to make Getty the responsible party for any and all tank-related contamination by means of contractual agreement was unsuccessful as a negotiating effort, and is unavailing in this action. Getty at no time agreed either orally or in writing to assume such obligations, and it therefore is not contractually bound to perform a duty which it did not contract to assume. Presumably, plaintiff would not have been without remedies if Getty had committed waste on the property by walking off in the middle of the job or by unduly damaging the property by removing the tanks in a negligent manner. *See generally, Camden Trust Co. v. Handle*, 132 N.J.Eq. 97, 26 A.2d 865 (E. & A.1942); *Smith v. Salvation Army*, 104 N.J.L. 102, 103–105, 140 A. 298, 299–300 (E. & A.1928). Plaintiff also presumably could have contacted the Department of Environmental Protection or local inspecting authorities while the work was in progress, to have them determine that Getty was performing the work in accordance with regulatory requirements, including any then-current environmental regulations. Instead, plaintiff resolutely refused to allow Getty on to his property to perform the work unless his preconditions were met. Under those circumstances, Getty prudently chose not to risk disturbing the peace by exercising its contractual right "without notice to Operator [to] enter at any time ... and take back said Equipment," (Ex. J–1), and plaintiff cannot now be heard to complain that his contractual rights were thereby violated.

### 2. *Ownership of the Equipment after Termination of the Agreement*

Plaintiff appears to contend that since Getty allegedly owns the equipment, including the underground tanks, Getty has a continuing obligation to remove them. This raises the issue of who owns that equipment at this time. In support of plaintiff's argument that Getty continues to be the owner, plaintiff points to the fact that, in at least one year subsequent to 1989, Getty filed a registration certificate with the New Jersey Department of Environmental Protection showing Getty as owning the tanks. (Ex. J–23.) That is one of the facts to consider in analyzing this issue, but it alone is not dispositive since Getty appears to have made such fil-

ings to comply with governmental requirements while the issue of ownership remained unresolved between the parties to this action. Plaintiff might also point to the language of paragraph two of the Agreement, *supra*, which states in pertinent part that "the Equipment shall at all times remain the property of Company." However, that Agreement has long since terminated,[8] and that provision clearly had reference to the term of the bailment agreement, not in perpetuity. Therefore, the Court must examine the particular facts of this case, in light of applicable rules of common law, to determine the issue of ownership. At the outset of this analysis it should be noted that this case is atypical because here each party is seeking to establish that it does not own the equipment in question, whereas in most of the reported cases the parties were respectively claiming ownership. Nevertheless, the same legal principles apply.

The law recognizes that as a general rule, unless a contrary intent is clear, items of commercial equipment, even if firmly attached to realty, constitute "trade fixtures", and may be removed by the owner at the expiration of a lease of the property, at least where removal may be accomplished without material injury to the freehold. *See Handler v. Horns*, 2 N.J. 18, 24–25, 65 A.2d 523, 526 (1949) (refrigeration and other equipment installed in leased building); *Cen-*

*tral Chrysler Plymouth, Inc. v. Holt*, 266 N.W.2d 177 (Minn.1978) (automobile hoists installed in garage); *Ilderton Oil Co. v. R.J. Riggs*, 13 N.C.App. 547, 186 S.E.2d 691 (1972) (underground fuel tank, pump and accessory equipment); *Moffat v. White*, 203 Minn. 47, 279 N.W. 732 (1938) (gas pumps on concrete bases); *Standard Oil Co. v. La Crosse Super Auto Service*, 217 Wis. 237, 258 N.W. 791 (1935) (gasoline pumps and underground tanks); *Ottawa Public Fin. Corp. v. Blackley–Gould Corp.*, 281 Ill.App. 447 (1935) (boiler and underground tanks); *see also Wiggins Ferry Co. v. O. & M. Railway Co.*, 142 U.S. 396, 416, 12 S.Ct. 188, 194, 35 L.Ed. 1055, 1063 (1892) (railroad tracks); *see generally* 35 Am.Jur.2d Fixtures § 35. "Generally, what constitutes a trade fixture depends upon the facts of the particular case, but an article may generally be regarded as a trade fixture if it is annexed for the purpose of aiding in the conduct by the tenant of a calling exercised on the leased premises for the purpose of pecuniary profit." 36A C.J.S. Fixtures § 38b. The intent of the parties is often a controlling factor in deciding whether a given item is a "trade fixture." *Handler v. Horns*, 2 N.J. at 24, 65 A.2d 523; *Central Chrysler Plymouth, Inc.*, 266 N.W.2d at 179 (citing *Moffat v. White*, 279 N.W. at 734). The issue of intent is a question of fact. *Handler v. Horns*, 2 N.J. at 24–25, 65 A.2d 523.

---

**8.** 8. The Agreement provided with respect to termination:

"4. This agreement shall commence on the date hereof and continue until termination or expiration of the Supply Contract entered into between the parties, except as hereinafter provided.

. . . . .

6. In the event Operator does not comply with any of the terms and conditions of this agreement, or upon the happening of any one of the following events, except as otherwise provided by applicable law, Company may, upon two (2) days written notice to Operator, terminate this agreement, except, in the event Operator uses the Equipment for other than exclusively for Company's products, or Operator becomes financially insolvent or bankrupt, or the Supply Contract between Company and Operator is terminated, Company may forthwith without notice terminate this agreement, and in any manner take possession of the Equipment."

Under the facts of this case, as events unfolded between the parties, it appears that the gasoline supply arrangement (no written Supply Contract

was ever executed) terminated in or about August, 1987. After that, the parties negotiated for a possible lease of the premises to Getty, and simultaneously had their ongoing standoff concerning the manner of tank removal, until in or about October, 1989. Based upon this course of dealing, the parties indicated that the bailment Agreement continued for the duration of that period, despite the fact that when the supply arrangement ended in 1987, they could each have viewed the Agreement as terminated as soon as the equipment was redelivered to Getty. Nevertheless the Court finds that the original Agreement remained in effect while those later events transpired. *See Fast Bearing Co. v. Koppers Co.*, 181 Md. 203, 204–205, 29 A.2d 289, 290 (1942) (bailee who continues to hold and use the subject of the ·bailment after the bailment has ended is deemed to have done so under the original agreement). Further, the Court finds that the Agreement terminated at the latest in October, 1989. *See* discussion *infra* in this section.

■ The undisputed facts in this case demonstrate that the underground tanks and related equipment loaned by Getty to Sgro were "trade fixtures" at the time the parties entered into the Agreement in July, 1985. The equipment had been owned by Getty as lessee of the premises and used in Getty's business at this location before Sgro purchased the realty. Getty allowed the equipment to remain on the premises pursuant to the written Agreement which expressly stated in paragraph two that the "Equipment ... shall at all times remain, be considered and treated as personal property and in no sense fixtures or part of the real estate regardless of the manner in which the same is or may be installed or placed on the Station." The expressed intent of the parties and the circumstances at the time of the Agreement clearly establish that the equipment was to be treated as "trade fixtures" and thus removable by Getty at termination of the Agreement.

■ If the owner of the premises refuses to permit removal of trade fixtures under circumstances constituting conversion, the goods generally become part of the realty and the former owner may recover damages for conversion. *See, e.g., Central Chrysler Plymouth,* 266 N.W.2d at 180. If, on the other hand, the bailor or lessee has failed to remove the trade fixtures within a reasonable time after termination of the agreement under circumstances constituting abandonment, the goods become part of the realty and the bailor is barred from retrieving the goods or recovering damages. *See, e.g., Gutierrez v. Davis,* 618 F.2d 700, 702 (10th Cir.1980); *Towne v. Sautter,* 326 N.W.2d 694, 697 (N.D. 1982); *Wilson v. Owens,* 619 P.2d 866, 868 (Okla.1980); *Shannon v. Stookey,* 59 Ill. App.3d 573, 16 Ill.Dec. 774, 776, 375 N.E.2d 881, 883 (1978). The reasons for the failure of a bailor to remove trade fixtures or other chattels may vary depending upon the facts of the individual case. Based upon the facts in this case, it could be argued that either Mr. Sgro converted the equipment by his acts in preventing Getty from removing it, or that Getty abandoned its ownership of the equipment after Getty's removal attempts met with failure.

■ Any distinct act of dominion wrongfully exerted over the personal property of another, in denial of the other's right or inconsistent with that right, may generally be treated as a conversion of that property. *See* 8 Am.Jur.2d Bailments § 114. It is also well settled, in New Jersey and elsewhere, that in the context of a bailment the bailee's obligation to return the property is fixed when he receives possession under the bailment agreement, and he cannot thereafter prescribe the conditions under which he will perform that duty. *Dale v. See,* 51 N.J.L. 378, 18 A. 306, 307 (1889); *see generally* 8 Am.Jur.2d Bailments § 178. Thus, it has been held that a notice by the bailee, after the bailment has arisen, that the goods will only be returned on certain terms, amounts to a dictation by the bailee of the bailee's own terms, and the bailee's refusal to return the goods to the owner except on those terms, amounts to a conversion. *Dale v. See,* 18 A. at 307 ("[bailor's] refusal to restore the goods to the owner except upon [terms of bailor's own dictation] would be wrongful"); *accord Penthouse International, Ltd. v. Eastman Kodak Co.,* 179 N.J.Super. 155, 430 A.2d 971 (Ch.Div.1980), *aff'd,* 184 N.J.Super. 130, 445 A.2d 428 (App.Div.), *certif. denied,* 91 N.J. 248, 450 A.2d 567 (1982) (no breach of contract by film processor who refused to develop or return lewd pictures where customer had full knowledge of processor's policy before delivering film for processing); *see also Boiseau v. Morrissette,* 78 A.2d 777, 780 (D.C.1951). The fact that the bailee is the owner of the land on which the property is placed does not preclude his liability for conversion of the property. *See Cooper v. Business Inv. Co., Inc.,* 16 N.J.Super. 148, 83 A.2d 814 (Law Div.1951). "If a bailee actually converts property he is answerable therefor, no matter how good his intentions or how careful he has been. If the wrongful act is intentionally done, it is immaterial that the bailee may have mistakenly believed he was acting within his legal rights." 8 Am.Jur.2d Bailments § 121 (citing *Aetna Casualty & Surety Co. v. Higbee Co.,* 80 Ohio App. 437, 76 N.E.2d 404 (1947)). In sum, "[t]he bailor's right, on termination of the bailment, to have the subject of it returned to him in general requires that the bailee's return be

strictly in accordance with the terms of the bailment, especially where the parties have made provision therefor by express contract, and failure or refusal by the bailee so to return the property may render him liable for conversion, or for breach of his contract; and where his liability is construed as dependent on negligence, his failure to deliver the property after demand, or to account for nondelivery, is prima facie evidence of negligence." 8 Am.Jur.2d Bailments § 179.

■ This Court recognizes that there are certain situations under which a bailee may prescribe conditions which qualify his duty to return bailed property to the owner. *Mueller v. Technical Devices Corp.,* 8 N.J. 201, 211, 84 A.2d 620, 625 (1951); *Hildegarde, Inc. v. Wright,* 244 Minn. 410, 70 N.W.2d 257, 259–60 (1955) (reasonable for bailee to first require bailor to prove his title or right to possession before delivering property); *Bradley v. Roe,* 282 N.Y. 525, 27 N.E.2d 35, 38–39 (1940) (reasonable to qualify delivery upon proof of ownership). However, where the bailor has demanded redelivery and the bailee refuses unless certain conditions and terms are met, those conditions must be reasonable or the bailee will generally be deemed to have converted the property. 8 Am.Jur.2d § 128; *see, e.g., Hildegarde, Inc. v. Wright,* 70 N.W.2d at 260; *Boiseau v. Morrissette,* 78 A.2d at 780. The general rule that a conversion has taken place where the bailee acts unreasonably in qualifying his duty to deliver bailed property applies to situations where the bailee refuses to deliver the bailed property in defiance or derogation of the bailor's right to possession, especially where the bailment contract provides for the bailor's right to repossess the bailed property. *Hildegarde, Inc. v. Wright,* 70 N.W.2d at 260.

There is ample evidence which could support a contention that Mr. Sgro acted unreasonably in refusing to deliver Getty's equipment unless Getty agreed to abide by certain terms prescribed by Mr. Sgro and that Getty's equipment was thereby converted by Mr. Sgro in this case. The conditions which he attempted to require were neither agreed to at the outset of the bailment Agreement between the parties, nor at any time thereafter by modification of that Agreement. Indeed, the Agreement itself contained a standard integration clause stating that "[t]he parties have set forth in this agreement their entire understanding ... [and that this] agreement cancels any other agreement affecting the Equipment at the Station and may not be modified except in writing signed by the party against whom enforcement is sought." (Agreement ¶ 11.) Mr. Sgro prevented Getty and its contractor from entering his premises to retrieve the equipment and thereby intentionally exercised dominion over the property owned by Getty located there. However, Getty has not brought a claim against plaintiff for conversion, so this Court is not in a position to decide whether plaintiff received ownership of the equipment by acts constituting conversion. Nor is it necessary to do so in order to determine the ownership of the equipment in this case, because it is clear that Getty did abandon its ownership no later than October of 1989.

■ An owner of trade fixtures may generally remove them during the term of a lease or within a reasonable time after the expiration of the lease, and it is the prevailing view that even where the lessee has reserved the right to remove them "at any time," a reasonable time is contemplated. After such "reasonable time" has elapsed, if the lessee has failed to remove them, and has indicated an intent to abandon, the items are deemed abandoned and become part of the realty. The determination of what constitutes a reasonable time must rest upon the facts of each case. Likewise the determination of intent to abandon must rest upon the facts of each case. *See, e.g., Gutierrez v. Davis,* 618 F.2d 700, 702 (10th Cir.1980); *Wilson v. Owens,* 619 P.2d 866, 868 (Okla. 1980); *Shannon v. Stookey,* 59 Ill.App.3d 573, 16 Ill.Dec. 774, 375 N.E.2d 881, 883 (1978). These principles are equally applicable in the post-lease bailment situation presented here.

■ In this case, Getty made a definite effort to remove its remaining equipment when it sent its contractor to the premises with the necessary tools, personnel and vehicles on October 18, 1988. Getty's people were refused entry to the premises for that

purpose on that occasion, and were thereafter continually refused entry unless Getty would agree to plaintiff's demands contained in the "Terms of Tank Removal." Getty made no further attempts to approach the premises after the October 18, 1988 incident. Sgro's attorney wrote to Getty as of October 3, 1989 announcing an intention to "remove the tanks and dispose of them as abandoned property." (Ex. J–35.) Regardless of whether or not Mr. Sgro actually authorized that letter, *see supra* note 4, it is a fact that Getty did receive this letter and that Getty thereafter made no statements nor took any actions indicating that it had any further proprietary interest in the equipment. Indeed, even when Getty was sued by Sgro in March of 1991, almost two years later, Getty did not counterclaim for return of the equipment but defended on the grounds, *inter alia,* that they were excused of any alleged obligation to remove them in light of the acts of Sgro. Finally, at trial Getty presented testimony by its Group Field Engineer, Thomas Dickson, that Getty takes the view that it no longer owned the tanks after Sgro prevented their removal in October, 1988. Accordingly, it is the finding of the Court that Getty abandoned the equipment no later than the end of October of 1989, (after having received attorney Smith's letter of October 3, 1989, Ex. J–35) and that the bailment ceased and the former "trade fixtures" then became actual fixtures of the realty owned by Sgro.

■ Where a landowner or other bailee possesses property abandoned by another person, the bailee may lawfully remove the property from the premises, or may himself leave the premises, without being liable for any subsequent loss. *See Rodgers v. Crum,* 168 Kan. 668, 215 P.2d 190, 192–94 (1950); *accord Banks v. Korman Assoc.,* 218 N.J.Super. 370, 527 A.2d 933 (App.Div.1987); *Capezzaro v. Winfrey,* 153 N.J.Super. 267, 379 A.2d 493 (App.Div.1977). It logically follows that if the bailee chooses to remove the goods from his premises, he may recover the reasonable expenses of removal from the bailor. *Cf. Towne v. Sautter,* 326 N.W.2d

694, 697 (N.D.1982) (citing *Smith v. Boyle,* 66 Neb. 823, 92 N.W. 1018 (1902)) (landlord/tenant context).

■ No cases have been cited to the Court, and research has disclosed none, which have awarded specific performance to a landowner seeking the removal of abandoned property from his premises. This is not surprising in view of the nature of the remedy of specific performance, which is reserved for those rare and exceptional cases in which the objective is so unique that money damages will not suffice. *Weisbrod v. Lutz,* 190 N.J.Super. 181, 186–87, 462 A.2d 610, 612 (App.Div.1983). In this case, there is nothing unique about the items in question or the performance which is sought. The items are regular trade fixtures commonly used in the retail gasoline business. The requested performance, removal of those fixtures, can be accomplished by any qualified contractor, such as the Lombardo company previously hired by Getty. The fact that the cost and complexity of the removal job has increased with the passage of time does not support a conclusion that specific performance would be an appropriate remedy here.

It is the conclusion of this Court that Mr. Sgro had on his property as of the end of October of 1989, personal property formerly belonging to Getty which had possibly been converted by Sgro, but which had definitely been abandoned by Getty. At that point, Sgro had the option to leave the equipment where it was, or to dispose of it and seek to recover the reasonable costs from Getty. If Sgro had elected to dispose of it, he would have had to do so within a reasonable time in order for the expense of removal to be deemed reasonable.[9] Also, if Sgro had timely disposed of the equipment and claimed his expenses from Getty, then Getty could have asserted a defense that Sgro had converted the equipment and/or breached his contract with Getty, thus excusing Getty from any obligation to pay for the costs of removal. But this Sgro did not do. Instead, he elected to leave the fixtures in the ground where they have become, by operation of law, part

---

**9.** The Court finds upon the facts in this case that a reasonable time for Sgro to have disposed of the tanks and related equipment as abandoned property would have been by the end of the 1989 calendar year.

of the real estate owned by Sgro. Accordingly, it is the conclusion of this Court that Getty parted with ownership of the tanks and related equipment no later than the end of October of 1989, and that Sgro is the current owner of this equipment, in that he is the owner of the premises upon which the equipment is located.

## B. *The Claims for Damages*

▮ The Second Count of the Complaint seeks damages from Getty for alleged breach of the Agreement in the amount of lost rental value for the property. The factual allegations in Count Two are as follows:

2. Subsequent to purchasing the ... property in July, 1985, Plaintiff negotiated with a prospective tenant who agreed to enter into a Lease Agreement for the ... property conditional upon removal by Defendant of its pumps and tanks from the property and certification by Defendant that the soil is in compliance with state and federal regulations.

3. Plaintiff has been precluded from entering into the aforesaid lease agreement and into agreements with prospective tenants interested in leasing the subject premises due to Defendant's failure to remove its tanks and other items from the ... property.

4. As a result of the conduct of Defendant, as aforesaid, Plaintiff has been deprived of rental income for the subject premises, resulting in damages to Plaintiff.

(Compl. ¶¶ 2, 3.)

The Third Count seeks damages upon the same facts, on a claim of tortious interference with prospective economic advantage. The Fourth Count also seeks damages upon the same facts, on a claim of wrongful interference with plaintiff's contractual relationships.

Plaintiff cannot recover damages under the breach of contract claim asserted in Count Two, because no breach of contract has been established against Getty. *See* discussion *supra* section III.A.1.

▮ The claim contained in Count Three is based upon alleged tortious interference with prospective economic advantage.

To prevail on such a claim, the party with the burden of proof must establish (1) that the defendant unlawfully and intentionally interfered with a reasonable expectation of economic advantage, and (2) but for the interference by the defendant there was a reasonable probability that the anticipated economic benefit would have been obtained. *Leslie Blau Co. v. Alfieri*, 157 N.J.Super. 173, 185–86, 384 A.2d 859, 865 (App.Div.), *cert. denied*, 77 N.J. 510, 391 A.2d 523 (1978). In this regard, the plaintiff must demonstrate malicious interference on the part of defendant, which is defined as "the intentional doing of a wrongful act without justification or excuse." *Raymond v. Cregar*, 38 N.J. 472, 480, 185 A.2d 856, 860 (1962) (citing *Louis Schlesinger Co. v. Rice*, 4 N.J. 169, 181, 72 A.2d 197, 302 (1950)). A "wrongful act" means "any act which will, in the ordinary course, infringe upon the rights of another to his damage, except and unless it be done in the exercise of an equal or superior right." *Kurtz v. Oremland*, 33 N.J.Super. 443, 454–55, 111 A.2d 100, 107 (Ch.Div.), *aff'd*, 16 N.J. 454, 109 A.2d 286 (1954).

▮ There was testimony and evidence presented by both parties concerning the course of negotiations which plaintiff conducted at various times with Getty, and with other prospective lessees including Century Oil Co. However, the Court has determined that the continued presence of the equipment on plaintiff's property was due to plaintiff's refusal to permit Getty to remove it, and not due to any wrongful act by Getty. *See* discussion *supra* part III.A. The Court further finds that although Getty did decline to allow Century to use the Getty trademark in connection with a lease of the property by Century, such refusal was not wrongful but was within the exercise of Getty's equal or superior right, namely to control the use of its trademark. Thus, plaintiff has failed to prove that Getty unlawfully and intentionally interfered with a reasonable expectation of economic advantage, and therefore has failed to establish the first essential element of a claim for tortious interference with prospective economic advantage. Thus, Count Three must be dismissed.

Count Four contains the claim for wrongful interference with plaintiff's contractual relationships. "In order to obtain relief upon a claim for tortious interference with contract, plaintiff must prove (1) the existence of a contract; (2) that the defendant actually interfered with the contract; (3) that the defendant was not a party to the contract but rather was a third party; (4) that the defendant intentionally and maliciously, and hence unreasonably interfered with the relationship between the contracting parties; (5) that the defendant's conduct caused plaintiff damage." *Michael Halebian N.J., Inc. v. Roppe Rubber Corp.*, 718 F.Supp. 348, 360 (D.N.J.1989) (citing *Kopp, Inc. v. United Technologies, Inc.*, 223 N.J.Super. 548, 558–59, 539 A.2d 309 (App.Div.1988)) (other citations omitted); *see also Kurtz v. Oremland,* 33 N.J.Super. 443, 111 A.2d 100. In this case, it was stipulated in the Pretrial Order that no lease agreement for the premises or any portion thereof was executed by plaintiff between November, 1987 and February 15, 1991. (Pretrial Order ¶ 3.M.) Thus, there is no basis for plaintiff's claim in Count Four that Getty interfered with any existing contractual relationship of plaintiff at any time during the period that Getty is held to have owned the equipment. *See* discussion *supra* section III.A.2. Accordingly, plaintiff's claim for damages under Count Four must also be denied.

An Order accompanies this Opinion.

### ORDER

For the reasons stated in this Court's Findings of Fact and Conclusions of Law, filed even date herewith,

**IT IS** on this 17th day of June, 1994 **ORDERED** that judgment is entered in favor of defendant Getty Petroleum Corporation and against plaintiff Anthony P. Sgro dismissing the Complaint with prejudice; and

**IT IS FURTHER ORDERED** that defendant's counterclaim against plaintiff is dismissed as moot; and

**IT IS FURTHER ORDERED** that the parties shall bear their own costs.